# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

### No. ACM 39746

———————————

### UNITED STATES
*Appellee*

#### v.

### Derrick O. WILLIAMS
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 12 March 2021

———————————

*Military Judge:* Bradley A. Morris (arraignment and motions); John C. Degnan.

*Approved sentence:* Dishonorable discharge, confinement for 45 days, hard labor without confinement for 3 months, and reduction to E-1. Sentence adjudged 22 March 2019 by GCM convened at Francis E. Warren Air Force Base, Wyoming.

*For Appellant:* Major M. Dedra Campbell, USAF.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Jessica L. Delaney, USAF; Major Dayle P. Percle, USAF; Mary Ellen Payne, Esquire.

Before MINK, KEY, and ANNEXSTAD, *Appellate Military Judges*.

Judge KEY delivered the opinion of the court, in which Senior Judge MINK and Judge ANNEXSTAD joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

KEY, Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] He was sentenced to a dishonorable discharge, confinement for 45 days, hard labor without confinement for 3 months, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

On appeal, Appellant raises six issues: (1) whether the military judge erred by excluding statements made by the victim; (2) whether the military judge erred by admitting evidence of Appellant's previous court-martial acquittal; (3) whether the military judge erred by providing the court members an instruction on false exculpatory statements; (4) whether Appellant was denied due process by virtue of the Government pursuing a different theory of guilt than Appellant was charged with; (5) whether Appellant's sentence was rendered unlawfully severe when he was not correctly paid while he served his sentence; and (6) whether the military judge erred by not giving the Defense's requested instruction on consent. Appellant personally raises the fourth and sixth issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We have carefully considered Appellant's sixth claim and have determined it warrants neither discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Although not raised by Appellant, we consider whether he is entitled to relief for facially unreasonable post-trial delay. Finding no error prejudicial to the substantial rights of Appellant, we affirm.

## I. BACKGROUND

Appellant, a noncommissioned officer, was convicted of sexually assaulting a junior Airman, AM, at a Halloween costume party Appellant hosted at an on-base club on 28 October 2017.

AM went to the Saturday-night party with a married couple, Ms. BW and Ms. JW, who were friends with Appellant.[2] AM said that before she went to the party, she consumed "five or six" shots of cognac despite not having eaten anything all day. The three women arrived at the club around 2100 hours to find approximately 30 others in the ballroom, which was physically separated

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial, and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] Ms. JW was an active-duty co-worker of Appellant's at the time of the assault, but she separated from the military shortly before Appellant's court-martial. Her military grade at the time of the relevant events is not evident from the record.

from the club's bar. Ms. JW testified that at some point "early on" in the party, Appellant told her that AM "is fine." Trial counsel refreshed Ms. JW's recollection that she had originally told investigators that Appellant "was talking about how cute [AM] was" and said he "would f[**]k the sh[*]t out of her," but she did not recall when he said that. Appellant was married, but his wife did not attend the party due to an illness. He was dressed as a gladiator in a costume that primarily consisted of a knee-length tunic.

As time went on, partygoers began leaving the party, and those who remained, to include AM, Ms. BW, and Ms. JW, migrated to the bar area where a surveillance camera captured events there. Portions of recordings taken by this camera and another camera in a nearby hallway were admitted into evidence for the time period running from approximately 2300 hours to 0100 hours. Although Appellant, Ms. BW, and Ms. JW drank while at the party, AM was not served alcohol due to her being under the legal drinking age.

In the surveillance video footage from the bar area, AM, Ms. BW, and Ms. JW are standing at or near the bar from 2313 hours through approximately midnight. During this period, Appellant periodically walks into and out of the camera's view, eventually walking over to AM at 2327 hours and dancing up against her by placing his buttocks near her crotch area. This lasts for about ten seconds, and Appellant does it again shortly thereafter for about twenty seconds. Afterwards, Appellant and AM laugh and hug, and Appellant wanders out of view of the camera. During her testimony at Appellant's court-martial, Ms. JW described the dancing as "like a friendly dance." Other than this dancing with Appellant, AM is seen in the video talking to various party attendees, to include Ms. BW and Ms. JW. Ms. JW described AM as being "drunk at the party," but not loud, "just like more outgoing, like talkative" and slurring her words "just a little." Ms. BW said that at some point in the night AM's "eyes were like red, like bloodshot red," but her speech was unaffected "from what [Ms. BW] could tell."

No footage of the bar from midnight to 0030 hours was admitted at trial, but Ms. JW said she walked into the ballroom to get her purse so that she could close out her bar tab. In the ballroom, she saw Appellant and AM dancing alone together with Appellant "twerking" on AM by placing his buttocks in her crotch area. Ms. JW testified that this time, AM "was not really present," and that she "was leaning against the wall" with Appellant's buttocks "holding her up." Ms. JW took out her phone and took a short video in which Ms. JW can be heard saying, "kill it, kill it, kill it." The video carries a time stamp of 0031 hours. Ms. JW put her phone away and turned to go back to the bar, and as she was leaving, she turned back around and saw Appellant kiss AM. She did not see AM lean into the kiss and described it as "forced for sure." Ms. JW said she found the episode "weird," but she "wasn't worried."

The surveillance camera footage admitted at trial picks back up at 0033 hours and shows Ms. JW standing by herself at the bar while Ms. BW is at a nearby table with five other people. AM walks into the frame and speaks briefly to Ms. BW before walking over to the bar to talk to Ms. JW for about 30 seconds and then returning to talk to Ms. BW. Approximately 15 seconds later, Appellant walks up to AM and hugs her a couple of times. They separate and speak to other partygoers, then Appellant puts his arm around AM's shoulders, and they walk out of the view of the camera at 0035 hours, at which point the video stops.

At trial, Ms. BW testified she had a conversation with AM in the bar area after which AM "walked away." In her testimony, Ms. BW did not say AM left with Appellant, but she said that after this conversation, Ms. BW and Ms. JW went to the bathroom together where they stayed for about ten minutes. While in the bathroom, Ms. JW took a picture of the two of them which was admitted into evidence and bears a timestamp of 0044 hours. Realizing they had not seen AM "for ten or fifteen minutes," Ms. BW and Ms. JW left the bathroom to look for AM.

As the two women walked out of the bathroom, they spotted movement in a nearby closet—a closet which had no door. When they looked in to investigate, they saw Appellant on top of AM with Appellant's costume pulled up above his waist such that his buttocks were exposed. AM's pants were pulled down and her legs were up in the air in front of Appellant. Ms. BW testified Appellant's "hips were aligned with [AM's] vagina" and Appellant was "thrusting up and down." She said AM did not appear to be interacting with Appellant, and that she "was just lying there on the floor. . . . Her arms were sprawled out to the sides of her . . . [a]nd her eyes were closed." Ms. JW described the scene in substantially the same way, but neither Ms. JW nor Ms. BW saw Appellant's penis and neither could testify that Appellant's penis penetrated AM's vagina.

The second surveillance camera captured video of the hallway just outside of the closet, but the recording does not show the interior of the closet at all. The video shows Ms. BW and Ms. JW walking up to the closet at 0045 hours. About one minute later, three other partygoers walk by. According to Ms. BW, just after she and Ms. JW found AM and Appellant in the closet, three people came down the hallway looking for Appellant. Ms. BW diverted the group away from the closet because she "didn't want to embarrass [her] friend." Once the three people were gone, Ms. BW said she turned back around to find Appellant "still thrusting up and down." She testified AM "was still the same . . . her arms weren't embracing him. They were out to her sides and [she] was still just lying there." Ms. BW then went into the closet, kicked Appellant in his side, and told him to get off AM. Appellant stood up and started adjusting his clothes, and AM's feet fell to the floor. Ms. BW said she helped AM get up "immediately,"

and AM "started adjusting herself." Ms. BW described AM as "just like discombobulated, like she didn't really have her balance," which Ms. BW ascribed to AM being "so drunk." Ms. BW told AM to meet her in the bathroom, and Ms. BW walked out of the closet. In the surveillance video, Ms. BW leaves the closet about a minute after the three people looking for Appellant walk by, and Appellant walks out about ten seconds later at 0048 hours.

Despite Ms. BW's directions, AM did not go to the bathroom. Instead, Ms. BW said she found AM near the bar area leaning against a wall for support and appearing "super drunk." Ms. BW said she noticed AM's jeans had been ripped at the knee, AM's eyes were red, and she was neither talking to anyone nor making any facial expressions. The surveillance video from the hallway camera, however, shows AM walking up to Ms. BW and Ms. JW near the closet entrance with a fourth woman at 0050 hours. Shortly thereafter, the group steps partially out of the camera's view, and AM is not visible for the next two minutes, but when she comes back into view, she is standing on her own and interacting with the other women until they all walk away at 0054 hours.

Meanwhile, footage from the bar shows Appellant seated at the bar at 0051 hours, about three minutes after he left the closet, talking to the bartender and the club manager, Technical Sergeant (TSgt) NB, as well as a few other partygoers. TSgt NB—who considered herself good friends with Appellant—noted Appellant had disappeared from the bar for "roughly ten to fifteen minutes" and when he returned to the bar, she asked where he had been. Appellant said he "didn't know" and appeared confused to TSgt NB. She testified that Appellant then said "something to the effect of was [he] being good or did [he] do something bad," and at some point volunteered that his wife keeps him out of trouble. TSgt NB agreed Appellant seemed extremely drunk and described him as "[t]he drunkest [she had] ever seen him." Around this same time, TSgt NB said she saw AM in the hallway "hunched over with [Ms. BW] kind of holding her or helping her." TSgt NB said AM appeared upset and that she was leaning against the wall.

The last bar video shows Ms. BW and Ms. JW walking into the bar just after 0054 hours and Appellant hugging each of them separately, with his mouth near their ears. Ms. JW, whom Appellant hugged first, testified Appellant asked her, "Did I just f[**]k your friend?" Ms. JW said she told him, "yes, you did," and he then turned to talk to Ms. BW who described Appellant as "talking in [her] ear" in "like a whisper." She testified Appellant said, "please don't tell me that I just had sex with your friend." With her arm around Appellant, Ms. BW told him he had, and Appellant "asked [her] not to say anything." Ms. JW testified she "maybe" hugged Appellant goodbye, but she did not tell him anything was wrong. In the video, AM walks into view at 0056 hours, and then she leaves again with Ms. BW and Ms. JW moments later.

AM, Ms. BW, and Ms. JW were driven by a designated driver to Ms. BW's and Ms. JW's house. In the car ride, Ms. BW said AM "wasn't saying anything" and did not seem to understand what was going on. Once at the house, AM vomited and fell asleep. The next morning, Ms. BW and Ms. JW told AM they saw Appellant having sex with her in the closet at the club. Ms. BW testified AM broke down in tears but did not want to report Appellant out of fear of getting in trouble for drinking underage. Ms. BW, an Air Force civilian employee, told her supervisor about the events at the party the following Monday which, in turn, led to an investigation being initiated by the Air Force Office of Special Investigations (AFOSI).

At Appellant's trial, AM testified she remembered Appellant dancing in front of her at the bar. She said, "I found it funny that a grown man would be kind of bent over in front of me but I really didn't think anything of it." She remembered going to the bathroom at the club at some point, noting that she was drunk. Her next memory was being on the couch in Ms. BW's and Ms. JW's house, throwing up, and going back to sleep. She testified she woke up at 0600 hours and went to the bathroom and she noticed "a sensation on [her] vagina. . . . It was just sore, throbbing." She also noted her menstrual phase had begun and testified, "Whatever happened probably triggered it." AM said she went back to sleep and next woke up with Ms. BW and Ms. JW on the couch with her. Once they explained what they had seen, AW testified, "I was sad. I was shook. I was just confused. I was just lost, honestly." On cross-examination, trial defense counsel asked AM, "So you don't remember if you actually chose to engage in this intimate activity with [Appellant]?" AM replied, "No."

In the ensuing investigation, Appellant's house was searched by AFOSI agents who found the costume Appellant had been wearing at the party in the washing machine. The costume was the only article of clothing in the machine, and it was wet when the agents found it. One agent testified that it smelled like "a strong cleaner" had been used, because the machine "smelled essentially like a pool, like chlorine." AM also underwent a sexual assault forensic examination, the timing of which is unclear from the record, although one witness said the examination appeared to have been conducted "less than thirty-six hours" after the assault. The examination found no semen or male DNA in samples taken from AM's body, but evidence of the presence of Appellant's DNA was found on the inside of AM's underwear. In an interview with an AFOSI agent, AM said that after the assault, she felt "pain inside of her vagina."

## II. DISCUSSION

### A. Evidence Excluded Under Mil. R. Evid. 412[3]

Just prior to Appellant's sexual conduct with AM in the closet at the club, AM had brief conversations with Ms. BW and Ms. JW in the bar area. At trial, Appellant sought to introduce the substance of those conversations, but the Government objected, arguing such evidence was prohibited under Mil. R. Evid. 412. The military judge ruled in the Government's favor, and Appellant asserts on appeal that the military judge's ruling excluding the evidence was erroneous. We disagree.

### 1. Additional Background

In her conversation with Ms. JW, AM essentially expressed an interest in potentially engaging in sexual conduct with another person.[4] Ms. JW told AM to go talk to Ms. BW about it, which AM briefly did. Ms. BW chalked the conversation up to AM "just drunk talking." Appellant and AM walked out of the bar area together moments later.

The Defense moved to admit the substance of AM's brief conversations with Ms. BW and Ms. JW under two primary theories: first, that the conversations demonstrated AM's interest in sexual activity, and second, that they showed that AM had the ability to consent to sexual conduct in that she was having conversations about such shortly before being found in the closet with Appellant. The Government opposed, and the military judge denied the motion in a written ruling dated 10 December 2018 after a motions hearing, finding that an interest in sexual activity with persons other than Appellant was "neither relevant nor material to the Defense's case" as it did "not make a fact in issue in this case more or less probable. It has no bearing on whether AM consented to anything with [Appellant]." The military judge further concluded evidence of AM and Appellant dancing together and kissing "pertain[ed] to the issue of consent," and was being admitted, but he did not otherwise address whether the conversations demonstrated AM's ability to consent. Finally, the military judge found "the probative value of this evidence is outweighed by the danger of unfair prejudice and confusion of the issues" without comment as to how he arrived at that conclusion.

Between the hearing and Appellant's trial, a different military judge was detailed, and on 1 March 2019 the Defense sought reconsideration of the ruling. The Defense asserted that the Government's theory in the case was that

---

[3] This issue was filed under seal and the discussion, *supra*, only reveals that which is necessary to resolve the issue.

[4] This other person was not Appellant.

AM could not consent to sexual conduct with Appellant due to her level of intoxication and, therefore, AM "contemplating sex right before the alleged assault" was evidence critical to rebutting that theory, as it demonstrated AM's mental capacity "to make important decisions." Trial defense counsel explained they were not trying to demonstrate AM had a general willingness to consent to sexual conduct.[5] The military judge denied the reconsideration motion without discussion at the beginning of Appellant's trial on the merits. He issued a written ruling two and a half months after the trial concluded in which he explained that the Defense had not identified any new evidence other than the surveillance videos, the substance of which had been previously documented in the report of investigation.[6] The military judge declined to revisit the prior military judge's ruling based upon a lack of new evidence or change in the law.

During the findings portion of Appellant's trial, while being questioned by the Government, Ms. BW testified about her conversation with AM, describing AM as "just babbling, just talking about random stuff." Ms. BW also noted AM was talking loudly, but her speech was not slurred. Neither party elicited any testimony from Ms. JW about her conversation with AM, and AM did not testify about either conversation.

**2. Law**

We review a military judge's ruling that excludes evidence under Mil. R. Evid. 412 for an abuse of discretion. *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted). A military judge abuses his or her discretion when the military judge's "findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. White*, 80 M.J. 322, 327 (C.A.A.F. 2020) (quoting *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010)).

---

[5] Trial defense counsel raised other theories of admission at trial; however, Appellant has not asserted them on appeal and we do not address them in this opinion.

[6] Although the Government possessed the surveillance videos prior to the original motion hearing, agents had encountered difficulties transferring the videos to media that could be provided to the Defense. The Defense received the videos shortly before Appellant's trial on the merits began.

Under Mil. R. Evid. 412, evidence of an alleged victim's sexual predisposition and evidence that an alleged victim engaged in other sexual behavior is generally inadmissible. Mil. R. Evid. 412(a). The intent of the rule is to "shield victims of sexual assaults from the often embarrassing and degrading cross-examination and evidence presentations common to sexual offense prosecutions." *United States v. Ellerbrock*, 70 M.J. 314, 318 (C.A.A.F. 2011) (original alteration, internal quotation marks, and citations omitted). One exception to this rule is when exclusion of the evidence would violate an accused's constitutional rights. Mil. R. Evid. 412(b)(1)(C). It is the defense's burden to demonstrate the exception applies. *United States v. Banker*, 60 M.J. 216, 223 (C.A.A.F. 2004). In order to show that the exclusion of evidence would violate an accused's constitutional rights, the defense must show that the evidence is relevant, material, and favorable to his defense, "and thus whether it is necessary." *Id.* at 222 (quoting *United States v. Williams*, 37 M.J. 352, 361 (C.M.A. 1993) (internal quotation marks omitted)). The term "favorable" means the evidence is "vital." *United States v. Smith*, 68 M.J. 445, 448 (C.A.A.F. 2010). Moreover, the probative value of the evidence must outweigh the dangers of unfair prejudice under a Mil. R. Evid. 403 analysis. *United States v. Gaddis*, 70 M.J. 248, 256 (CA.A.F. 2011). Military judges have "wide discretion" in applying the Mil. R. Evid. 403 balancing test; however, military judges are afforded less deference when they do not explain their analysis on the record, and we give them no deference when they do not conduct the analysis at all. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000).

**3. Analysis**

On appeal, Appellant argues the military judge abused his discretion by excluding the substance of AM's conversations with Ms. BW and Ms. JW because the evidence was constitutionally required under Mil. R. Evid. 412(b)(1)(C), as it demonstrated that AM was capable of consenting to sexual activity. Appellant further argues that by not being able to present the substance of the conversations, the Government "capitalized" on the situation by portraying AM as "speaking incoherently moments before she was allegedly assaulted." Appellant asserts the initial military judge failed to consider how the evidence pertained to AM's capacity to consent, as he neither made any findings regarding AM's degree of intoxication nor addressed the capacity issue in his analysis. Because the evidence was excluded, Appellant argues his ability to cast doubt on Ms. BW's and Ms. JW's characterization of AM as being unresponsive in the closet was compromised. The Government responds that Appellant was charged under a theory of causing bodily harm to AM without her consent, not to assaulting her while she was incapable of consenting, and that there was "substantial other evidence" showing AM's competence, to include the surveillance video footage and witness testimony about AM's ability to walk, talk, and dance close in time to the assault.

As noted by the Government, Appellant was charged with sexually assaulting AM by causing her bodily harm, a charging decision which required AM's lack of consent to the sexual conduct to be proven beyond a reasonable doubt. The Government's case at trial did not involve any direct evidence AM did not consent. Indeed, trial counsel never asked AM whether she consented or not, and trial defense counsel elicited AM's concession that she did not remember whether or not she chose to engage in the sexual conduct with Appellant. Without direct evidence proving AM's lack of consent, the Government elected to focus on circumstantial evidence, a large degree of which centered on AM's apparent lack of ability to consent.

The opening lines of trial counsel's closing argument illustrate the Government's theory of the case, as trial counsel described AM as being "vulnerable and drunk;" "unaware and unable to resist;" "passed out in a closet;" "dead to the world;" and "motionless." Trial counsel asked the members to infer AM did not consent "based on the surrounding circumstances," which trial counsel identified as AM's eyes being closed and her "lying there motionless on the floor." Trial counsel asked, "What actions or words or communication is she giving the accused to know that it is okay to put your penis inside of [her]? Nothing." At the conclusion of his argument, trial counsel told the members: "He found, had her isolated, passed out in a closet, and sexually assaulted her." In his rebuttal argument, trial counsel offered the clearest explanation of his theory on the issue of consent when he told the members, "It was sexual assault because she was unable to consent, she didn't consent, and he performed the sexual act on her." In other words, his argument was AM did not consent because she could not consent.

In light of this theory of Appellant's culpability, AM's ability—or lack thereof—to consent to the sexual conduct was directly at issue. Therefore, her capacity to carry on a conversation immediately before the alleged assault is plainly relevant to establishing her cognitive abilities at the time. Contrary to Appellant's argument, however, the subject matter of such conversation is far less relevant than the degree to which AM could communicate coherent thoughts and respond to inputs from the other conversation participants. The fact that AM had relayed an interest in potentially engaging in sexual conduct with someone may have shed some light on AM's sexual interests at the time, but those interests did not include Appellant—and there was no evidence Appellant had any knowledge of the conversations at all. As a result, AM's expressed sexual interests amount to the sort of sexual-behavior or sexual-predisposition evidence Mil. R. Evid. 412 is designed to exclude, as the evidence would do little more than paint AM as being generally open to engaging in sexual conduct. We agree with the military judge that the subject of AM's conversations with Ms. BW and Ms. JW was not material to the Defense's case, because AM's interest in sexual conduct with another has no bearing on

whether or not AM consented to sexual conduct with Appellant. As such, this evidence cannot rise to the level where its exclusion would violate Appellant's constitutional rights, and the military judge's ruling excluding the evidence was not an abuse of discretion.

While the specific subject matter of AM's conversations with Ms. BW and Ms. JW sheds little light on AM's capacity to consent, her ability to have those conversations was far more pertinent to countering the Government's trial strategy. The first military judge's ruling, which contained only a single paragraph analyzing the admissibility of these conversations, did not differentiate between the subject matter of the conversations and the fact AM carried on conversations. However, nothing in the ruling indicates counsel were prohibited from introducing evidence about the surrounding circumstances of those conversations. The second military judge denied reconsideration of the motion simply because trial defense counsel did not produce any new evidence, and his summary ruling did not go into any further detail. Yet trial defense counsel did not pursue a line of inquiry with witnesses with respect to AM's ability to cogently participate in the conversations or otherwise seek clarification from the military judge as to whether or not they could ask Ms. BW and Ms. JW about the surrounding circumstances of the conversations without delving into their substance. Government counsel, however, did elicit brief testimony from Ms. BW about her observations of AM's demeanor during their conversation shortly before the alleged assault, but trial defense counsel did not ask any questions on the subject, nor did they ask Ms. JW about her conversation with AM. While Appellant asserts on appeal the Government was able to portray AM as incoherent shortly before the assault—a characterization which somewhat overstates Ms. BW's actual testimony—trial defense counsel did not avail themselves at trial of opportunities to demonstrate AM carried on coherent conversations. The Defense's decision not to do so at trial does not warrant relief on appeal.

## B. Evidence of Appellant's Previous Court-Martial

Nearly three years before his conviction in this court-martial, Appellant was acquitted of committing a sexual assault at a previous court-martial in July 2016 held at the same base. Over defense objection, the military judge permitted the Government to introduce evidence of the events supporting the earlier court-martial's charge. Appellant alleges the military judge erred. We disagree.

### 1. Additional Background

#### a. Appellant's First Court-Martial

In October 2014, AW—then a Senior Airman—went out to a bar with friends where she ran into another group which included Appellant. AW had

three cocktails at the bar, and she and Appellant danced with each other in a style AW characterized as "grinding." The group went to a second bar where AW did not drink, but she and Appellant continued suggestively dancing with each other. Sergeant (Sgt) ML[7]—one of the designated drivers in the group—described AW as "flirting" with Appellant and dancing with him by placing "her rear end in his crotch region." After that bar closed, Appellant, AW, Sgt ML, and Staff Sergeant (SSgt) AS went to Appellant's apartment where Appellant and AW wound up sitting on a couch together while AW rubbed Appellant's head. At some point, SSgt AS went outside to smoke and Sgt ML went with her, leaving Appellant and AW in the apartment alone. Still on the couch, Appellant and AW began kissing each other, and SSgt AS saw them doing so when she opened the door to come back into the house. She told Sgt ML what she had seen, and she and Sgt ML decided to go to Sgt ML's house around the corner rather than interrupt Appellant and AW.

According to AW's testimony, she stopped kissing Appellant "after a little bit" when she "realized what [she] was doing," and she stood up from the couch. AW said she and Appellant then talked about AW's boyfriend until Appellant "lifted [her] up behind the knees" and started carrying her to the back of the house. AW was eventually able to pull free from Appellant's grasp and away from him, and she went outside to look for SSgt AS, only to find SSgt AS was not there and that Sgt ML's car was gone. Due to the cold weather, AW went back into the apartment where Appellant and AW continued to converse. AW said Appellant told her that his wife was out of town and that they were "fighting anyway," and then he picked her up again and took her to a bedroom in the back of the apartment.

Once in the bedroom, Appellant set AW down such that she was standing in front of the bed, and Appellant proceeded to take off her pants and underwear. AW laid down on the bed, and Appellant laid on top of her, trying unsuccessfully to digitally penetrate her vagina. Appellant was then able to penetrate AW's vagina with his penis, and after some time passed, he pulled AW on top of him and continued to penetrate her vagina with his penis. AW testified she could not get off Appellant because "[h]is knees were up behind [her]" and he was holding one of her arms "on the bed or the wall." Eventually, Appellant got up and went to the bathroom, and AW dressed herself and went to the living room. When Appellant walked into the living room, AW told him she wanted to go home, and Appellant drove her there. The two conversed during the ride, and AW said Appellant told her, "I didn't know you liked me like that."

---

[7] Sgt ML was a noncommissioned officer at the time of these events, but he had separated by the time of Appellant's court-martial from which this appeal arises. His specific grade is unclear from the record, as he is only referred to as "Sergeant."

Sgt ML testified that the following day he saw AW, and AW and he "were laughing and joking about that night, how she was dancing and what have you." During the subsequent investigation, Appellant admitted to having sexual intercourse with AW, but he maintained the act was consensual. AW, however, said she did not consent to the sexual activity. Appellant was charged with sexually assaulting AW; he was acquitted on 29 July 2016.

### b. Appellant's Motion to Exclude Prior Acquittal

Prior to Appellant's trial in the instant case, trial defense counsel moved the military judge to exclude evidence of Appellant's alleged assault on AW under two theories: (1) the members could not find by a preponderance of evidence that Appellant committed the prior offense; and (2) the evidence failed the Mil. R. Evid. 403 balancing test by virtue of dissimilarities between the offense against AW and the offense against AM. The military judge denied the Defense's motion.

In the Government's opening statement, trial counsel told the members they would hear from AW during Appellant's trial explaining,

> [AW], too, was assaulted by [Appellant]. In fact, in October of 2014 [Appellant] used similar tactics and circumstances to isolate [AW] and force her to have sex with him. Now, in that 2014 case, when [Appellant] faced a general court-martial, the members of that panel were not able to find him guilty beyond a reasonable doubt. However, in this case, you will be given the opportunity to consider that event from 2014 in accordance with the instructions the [military] judge is going to give you later on.

Trial counsel did call AW to testify, and the Defense called Sgt ML, SSgt AS, and a special agent involved with the investigation into AW's allegations. Ultimately, the testimonial evidence in Appellant's trial underlying this appeal spanned 253 pages of the 776-page trial transcript, with 84 of those pages—or 33 percent—being devoted to the allegation pertaining to AW. Prior to closing arguments, the military judge provided the following instructions to the members:

> You heard evidence that [Appellant] may have committed a sexual offense against [AW]. [Appellant] is not charged with this other offense. This evidence may have no bearing on your deliberations, unless you first determine, by a preponderance of the evidence that is more likely than not, this other offense occurred. In regard to your determination of whether or not this other offense occurred, you may consider the fact that [Appellant] was acquitted or found not guilty of the sexual offense involving [AW] at a prior court-martial in 2016.

> If you determine, by a preponderance of the evidence, this other offense occurred, you may then consider the evidence of that other offense for its bearing on any matter to which it is relevant only in relation to the Charge and its Specification, or the lesser included offense of attempted sexual assault. You may consider the evidence of this other sexual offense for its tendency, if any, to show [Appellant]'s propensity or predisposition to engage in a sexual offense. You may not, however, convict [Appellant] solely because you believe he committed this other offense or solely because you believe [Appellant] has a propensity or predisposition to engage in a sexual offense. In other words, you cannot use this evidence to overcome a failure of proof in the government's case, if you perceive any to exist.

> [Appellant] may be convicted of an alleged offense only if the prosecution has proven each element beyond a reasonable doubt. Each offense must stand on its own and you must keep the evidence of each offense separate. The prosecution's burden of proof to establish [Appellant]'s guilt beyond a reasonable doubt remains as to each and every element of the offense alleged in the Charge and its Specification, or the lesser included offense of attempted sexual assault.

Trial counsel highlighted AW's testimony in his closing argument, eventually telling the members,

> Now I do not want you to convict [Appellant] of this offense just because the other one happened and the military judge's instructions tell you just that. But you can consider it for anything you think is relevant. Anything. So if you want to know does this person have a propensity to commit sexual offenses? Does it tell you something about the way he views women? About his respect for another person's body. Does it give you insight into his thought process? That is for you to consider.

The Defense argued to the members that the sexual conduct between AW and Appellant was consensual and that the Government had introduced the conduct simply to "prop up their weak case." In rebuttal argument, trial counsel returned to the issue of AW and argued Sgt ML and SSgt AS had not undermined AW's testimony because they were not at the apartment at the time of the alleged assault.

**2. Law**

Under Mil. R. Evid. 413, evidence that an accused has committed another sexual offense may be admitted and "considered on any matter to which it is

relevant." Mil. R. Evid. 413(a). The term "sexual offense" includes any conduct prohibited by Article 120, UCMJ, which includes the offense of sexual assault. Mil. R. Evid. 413(d)(1). Inherent in the rule is "a general presumption in favor of admission." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (quoting *United States v. Berry*, 61 M.J. 91, 94–95 (C.A.A.F. 2005)). We review a military judge's decision to admit evidence under Mil. R. Evid. 413 for an abuse of discretion. *Id.* (citation omitted).

The three threshold requirements for admitting evidence under Mil. R. Evid. 413 include the accused being charged with a sexual offense, the proffered evidence being evidence of the accused having committed another sexual offense, and the proffered evidence being relevant to the case being tried. *Berry*, 61 M.J. at 95. In order to conclude there is evidence of another offense, a court must determine that the members could find the other offense occurred by a preponderance of the evidence. *United States v. Wright*, 53 M.J. 476, 483 (C.A.A.F. 2000) (citing *Huddleston v. United States*, 485 U.S. 681, 689–90 (1988)). Once these requirements are met, "it is a constitutional requirement that evidence offered under [Mil. R. Evid.] 413 be subjected to a thorough balancing test under [Mil. R. Evid.] 403." *Id.* The employment of a careful balancing test is required due to "the potential for undue prejudice that is inevitably present when dealing with propensity evidence." *United States v. James*, 63 M.J. 217, 222 (C.A.A.F. 2006). An incorrect ruling risks injecting a court-martial with a "distracting mini-trial on a collateral matter of low probative value." *Solomon*, 72 M.J. at 181. The fact an accused was acquitted of committing the other sexual offense, standing alone, does not prevent its introduction under Mil. R. Evid. 413, but the military judge must give the acquittal "due weight," as it may serve to reduce the strength of the proof of the other offense. *Id.* at 182. Our superior court, the United States Court of Appeals for the Armed Forces (CAAF), has cautioned that "great sensitivity" is called for in determining whether or not to admit evidence of prior acts of which an accused was previously acquitted. *United States Griggs*, 51 M.J. 418, 420 (C.A.A.F. 1999) (analyzing admission of acquittal for purposes of demonstrating intent and absence of mistake under Mil. R. Evid. 404(b)).

### 3. Analysis

Because Appellant was charged with committing a sexual assault against AM—a sexual offense under Article 120, UCMJ—and because Appellant's conduct with AW would amount to the same type of offense, the first two threshold requirements of Mil. R. Evid. 413 were met. The third requirement is that the evidence was relevant under Mil. R. Evid. 401. Under that rule, evidence is relevant when it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. In his ruling, the military judge said

nothing about how the alleged offense regarding AW was relevant to the offense relating to AM; he simply noted, "I find this evidence to be relevant" without elaboration. Notwithstanding the absence of analysis on this point by the military judge, we conclude evidence of Appellant committing a prior sexual assault has at least a marginal tendency to make it more probable he committed a later assault under the theory Appellant had demonstrated some degree of a propensity for committing such offenses.

After meeting the threshold requirements under Mil. R. Evid. 413, the military judge was required to subject the evidence to a thorough and careful balancing test under Mil. R. Evid. 403. Proper application of this rule results in the exclusion of evidence, even though relevant, if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members." The CAAF has identified various non-exclusive factors to consider in conducting the Mil. R. Evid. 403 balancing test with respect to evidence offered for admission under Mil. R. Evid. 413:

> the strength of the proof of the prior act; the probative weight of the evidence; the potential to present less prejudicial evidence; the possible distraction of the fact-finder; the time needed to prove the prior conduct; the temporal proximity of the prior event; the frequency of the acts; the presence of any intervening circumstances; and the relationship between the parties.

*Berry*, 61 M.J. at 95 (citing *Wright*, 53 M.J. at 482).

The military judge did consider these factors, although his analysis was fairly perfunctory in most respects. He found the strength of the proof of the offense against AW to be "high," as it was "more than gossip." He noted that Appellant's trial on the offense relating to AW "resulted in less than a conviction," but he was nevertheless "satisfied that the strength of proof is sufficient on this evidence" with no further discussion of how he arrived at this conclusion. He did not explain whether or how the fact Appellant's prior court-martial ended in acquittal factored into his analysis.

Nevertheless, the military judge found the probative value of the evidence "sufficient" due to similarities in the two offenses, to wit: (1) Appellant's wife was not present; (2) AM and AW were junior Airmen with whom Appellant did not have a notable prior relationship; (3) AM and AW were "extremely intoxicated;" (4) AM and AW "proceeded to dance/kiss with" Appellant; and (5) the assaults occurred in "a private location." The military judge determined "that the temporal proximity and frequency of the acts is sufficiently met" based upon the two incidents occurring "just over three years apart." He did not comment on the frequency of the acts, but he did note AM and AW did not know

each other. Finally, the military judge found the evidence would not be a distraction to the members, because trial counsel only intended to call one witness, AW, to testify on the matter, although he did note it was "possible" that the Defense would "seek to admit more to counter AW's testimony." Based upon the foregoing, the military judge concluded the evidence regarding AW was not substantially outweighed by the danger of unfair prejudice, and he denied the Defense's motion.[8]

On appeal, Appellant argues the offense regarding AM was "vastly different" from that involving AW because AW was not so intoxicated that she was either unconscious or that her memory was even impaired. Appellant also argues the military judge erroneously concluded the members could find by a preponderance of the evidence Appellant had committed the offense on AW in light of the fact she had been seen flirting with, touching, and kissing Appellant prior to the alleged assault. Appellant also argues the military judge did not consider AW's motive to fabricate the assault allegation, as she purportedly only reported she had been assaulted once she learned rumors were circulating around her workplace about her sexual conduct with Appellant.

The military judge's ruling in this instance does give us pause, as it provides little indication of the careful and thorough Mil. R. Evid. 403 analysis required in analyzing evidence proffered for admission under Mil. R. Evid. 413, an analysis of a constitutional dimension. *See James*, 63 M.J. at 222; *Wright*, 53 M.J. at 483. Because the evidence the Government sought to admit resulted in acquittal, that fact required "great sensitivity" in determining whether the evidence should be allowed. *See Griggs*, 51 M.J. at 420. If the military judge did give this issue the required degree of consideration, such is not evident from his ruling, as the military judge provided only broad and conclusory statements, stating, for example, he was "satisfied that the strength of proof is sufficient on this evidence" without any further explanation. At least one of the military judge's findings of fact—that AW was "extremely intoxicated"—was not just unsupported by the record, but at odds with the evidence presented, thereby amounting to clear error. We are also unclear how the military judge concluded a closet without a door in an on-base club where a party was underway amounted to "a private location." As a result, we give the military judge's conclusions of law minimal deference. *See Berry*, 61 M.J. at 96.

Even though the military judge did not conduct his analysis with the constitutionally required rigor, and in spite of his erroneous findings of fact, we conclude the military judge ultimately did not err in admitting evidence of Appellant's prior conduct with AW. The evidence regarding that offense is not

---

[8] The Defense sought reconsideration of this ruling, but this was denied by the second military judge based upon the absence of either new evidence or a change in the law.

particularly strong as it hinges entirely upon the credibility a factfinder chooses to attach to the sole witness, AW. Yet, so long as a factfinder concludes AW is credible and that the offense more likely than not occurred without her consent in the manner she described, that factfinder could conclude Appellant committed the offense by a preponderance of the evidence, if not beyond a reasonable doubt. That AW may have acted flirtatiously towards Appellant does not disprove her stated lack of consent to sexual conduct with Appellant, conduct which occurred after Sgt ML and SSgt AS had left the apartment. Thus, we find the members could conclude, by a preponderance of the evidence, that Appellant sexually assaulted AW, even though an earlier court-martial did not conclude he did so beyond a reasonable doubt—a substantially higher burden of proof.

We further conclude that Mil. R. Evid. 403 would not operate to exclude evidence of Appellant's conduct with AW, although it is an admittedly close call. Both the conduct regarding AW and that regarding AM involve allegations of Appellant engaging in extramarital sexual intercourse with adult military women without their consent after evenings of drinking and socializing. The similarities largely stop there.[9] The probative value of the evidence regarding AW was that it indicated Appellant had some degree of propensity for engaging in sexual conduct with women without their consent, and the admission of such evidence was highly prejudicial to Appellant in that it portrayed him as a predatory serial offender. The evidence regarding AW *did* result in a mini-trial within Appellant's court-martial, largely re-litigating Appellant's first court-martial.[10] Nonetheless, we conclude the prejudice to Appellant's case regarding AM was not unfair to Appellant insofar as Appellant's acquittal was made known to the members at the outset of his trial, and the probative value of Appellant's predisposition was not *substantially* outweighed by the danger of confusing the issues. Trial counsel told the members in his opening statement the military judge would give them instructions on how to use the evidence, and the military judge later did so, correctly explaining what the evidence could be used for and what initial conclusions the members had to make before they could use it. Thus, the military judge's instructions served to minimize, if not eliminate, any potential confusion of the issues at trial. In light of the foregoing, we conclude the military judge did not abuse his discretion in admitting

---

[9] Although both AW and AM were Airmen junior in grade to Appellant, there is no indication this grade differential was a factor in either case.

[10] The Defense's motion to exclude this evidence made it clear the matter would be contested at trial, stating: "Hours of trial time would be spent re-litigating something that was already adjudicated two years ago."

evidence of Appellant's prior offense against AW at the court-martial now before us.

## C. Instruction on False Exculpatory Statements

Appellant argues the military judge erred in instructing the members, over defense objection, on the doctrine of false exculpatory statements. We agree that the evidence was insufficient to warrant the military judge's instruction, but this error did not prejudice Appellant.

### 1. Additional Background

During a hearing outside the presence of the court members, trial counsel requested the military judge provide an instruction on false exculpatory statements based upon the comments Appellant made to Ms. JW and Ms. BW at the end of the party, wherein he asked Ms. JW, "Did I just f[**]k your friend?" and said to Ms. BW, "please don't tell me that I just had sex with your friend." He also asked Ms. BW to "not to say anything." Trial defense counsel objected to the instruction on the grounds that these comments were not capable of being either true or false. To the extent any assertion could be derived from the statements, trial defense counsel argued it would be that Appellant did not have a clear recollection of whether he had engaged in sexual conduct with AM, and there was no evidence indicating Appellant did have a clear recollection, so the assertions had not been shown to be false or otherwise contradicted by the evidence.

The military judge disagreed, saying,

> I think a legitimate other interpretation is that [Appellant] was caught in the middle of a crime and then fabricating an excuse. . . . I think the members can find that [Appellant] fabricated, and you can call it misleading, you can call it false, you can call it a lie. He made up some story to get himself out of trouble. That's one way of looking at it and I think that's supported by the evidence.

The military judge gave the following instruction to the members:

> There has been evidence that after the offense was allegedly committed [Appellant] may have provided a false explanation about the alleged offense to Ms. [BW] and Ms. [JW]. Conduct of an accused, including statements and acts done upon being informed that a crime may have been committed or upon being confronted with a criminal charge, may be considered by you in light of other evidence in the case in determining the guilt or innocence of the accused. If an accused voluntarily offers an ex-

planation or makes some statement tending to establish his innocence, and such explanation or statement is later shown to be false, you may consider whether this circumstantial evidence points to a consciousness of guilt.

You may infer that an innocent person does not ordinarily find it necessary to invent or fabricate a voluntary explanation or statement tending to establish his innocence. The drawing of this inference is not required. Whether the statement was made, was voluntary, or was false, is for you to decide. You may also properly consider the circumstances under which the statements were given, such as whether they were given under oath, and the environment under which they were given.

Whether evidence as to an accused's voluntary explanations or statement points to a consciousness of guilt, and the significance, if any, to be attached to any such evidence, are matters for determination by you, the court members.

In closing, trial counsel argued to the members,

Did I just have sex with your friend? Did I just have sex with your friend? Don't tell anyone. He's whispering. He knows what happened. He knows that he just had sex with [AM]. And as the military judge instructed you earlier, and you'll have this during your deliberations, is that there are false exculpatory statements. That is an instruction you will have and you may consider whether this evidence points to a consciousness of guilt. You may infer than [sic] an innocent person does not ordinarily find it necessary to invent or fabricate a voluntary explanation or statement tending to establish his innocence. Again, that is not me telling you this. These are the instructions crafted by the military judge that you can consider.

In response, trial defense counsel sought to portray Appellant's comments as reflecting Appellant's concern that he—a married man—had been caught having sexual intercourse with another woman. Trial counsel did not return to the issue in rebuttal.

### 2. Law

Rule for Courts-Martial (R.C.M.) 920(a) requires the military judge to provide members appropriate findings instructions, and under R.C.M. 920(c), any party may request the military judge give particular instructions. "Appropriate instructions" under R.C.M. 920(a) are "those instructions necessary for the members to arrive at an intelligent decision concerning appellant's guilt." *United States v. Baker*, 57 M.J. 330, 333 (C.A.A.F. 2002) (citations omitted).

Although military judges have "wide discretion in choosing instructions to give," those instructions must "provide an accurate, complete, and intelligible statement of the law." *United States v. Behenna*, 71 M.J. 228, 232 (C.A.A.F. 2012). In instructing the members, "the military judge should not give undue emphasis to any evidence favoring one party." *United States v. Damatta-Olivera*, 37 M.J. 474, 479 (C.M.A. 1993).

We review the adequacy of a military judge's instructions de novo. *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003). A military judge's determination whether to grant a request for a non-mandatory instruction is reviewed for an abuse of discretion. *United States v. Barnett*, 71 M.J. 248, 249 (C.A.A.F. 2012). When a military judge commits an instructional error, we assess prejudice by viewing the military judge's instructions as a whole. *United States v. Maxwell*, 45 M.J. 406, 424 (C.A.A.F. 1996) (citing *United States v. Snow*, 82 F.3d 935, 938–39 (10th Cir. 1996)).

"[E]xculpatory statements by an accused which are successfully contradicted or otherwise shown to be false may be considered as evidence of a 'consciousness of guilt.'" *United States v. Opalka*, 36 C.M.R. 938, 944 (A.F.B.R. 1966) (quoting *United States v. Hurt*, 22 C.M.R. 630 (A.B.R. 1956) (additional citation omitted)). The United States Supreme Court has explained that false statements made by an accused may be considered by the jury as tending to show guilt, because "destruction, suppression or fabrication of evidence" suggests a consciousness of guilt—a matter "to be dealt with by the jury." *Wilson v. United States*, 162 U.S. 613, 621 (1896).

### 3. Analysis

The relevant force of a false exculpatory statement derives from the degree to which it demonstrates an accused's consciousness of guilt. As one of our sister courts has noted, "the fabrication of false and contradictory accounts by an accused criminal, for the sake of diverting inquiry or casting off suspicion is a circumstance always indicatory of guilt." *United States v. Elmore*, 31 M.J. 678, 685 (N.M.C.M.R. 1990) (quoting *Commonwealth v. Lettrich*, 31 A.2d 155, 156 (Pa. 1943)). Thus, false exculpatory statements belong to a subset within the larger category of evidence tending to demonstrate a consciousness of guilt. Ordinarily, the false-exculpatory-statement instruction is given when an accused has attempted to mislead investigators with stories later proven to be fabrications[11] or falsely denied committing a particular offense in response to

---

[11] *See, e.g.*, *United States v. Cool*, No. ACM 39714, 2020 CCA LEXIS 390, at *24–26 (A.F. Ct. Crim. App. 26 Oct. 2020) (unpub. op.) (during interview with law enforcement,

open-ended questioning,[12] which would fall in line with the military judge's instruction that, "an innocent person does not ordinarily find it necessary to invent or fabricate a voluntary explanation or statement tending to establish his innocence." While we conclude Appellant's statements do not amount to false exculpatory statements, we find they still amount to evidence of consciousness of guilt.

A false exculpatory statement has—by its terms—two fundamental requirements: first, the statement must be false, and, second, it must tend to be exculpatory. In order for a statement to be found to be false, there must ordinarily be some evidence of its falsity. *See, e.g.*, *Fox v. United States*, 421 A.2d 9, 13 (D.C. 1980) (noting the falsity of exculpatory statements providing an inference of consciousness of guilt is "typically is proven by independent direct evidence").[13] Here, we do not have statements by an appellant who sought to present a false alibi or to mislead investigators with false information. Instead, Appellant asked Ms. JW if he had just had sex with AM; he said to Ms. BW, "please don't tell me that I just had sex with your friend;" and he asked Ms. BW "not to say anything." None of these comments can be either true or false, because none of them asserts any fact subject to such inquiry. For example, the first of these is not a statement at all—it is a question, and questions do not typically assert anything. *See, e.g.*, *United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990). The third statement is a request that Ms. BW not reveal what she knew, and there is nothing factually asserted in that request subject to being disproven. The second statement is a combination of direction to Ms. BW to not tell Appellant he had just had sex with AM and a suggestion Appellant

---

an appellant denied specific facts related to investigation and suggested certain evidence did not exist); *United States v. Baas*, No. 201700318, 2019 CCA LEXIS 173, at *48–49 (N.M. Ct. Crim. App. 15 Apr. 2019) (unpub. op.) (an appellant claimed, *inter alia*, he was conversing with a friend from high school, which was proven to be false); *United States v. Clough*, 978 F.3d 810, 819–20 (1st Cir. 2020) (an appellant told investigators about his typical prescription habits in an anti-kickback case, but investigators were able to prove his habits were not as claimed); *United States v. Ath*, 951 F.3d 179, 187 (4th Cir. 2020) (an appellant claimed another person picked up a particular package, but video evidence showed it was the appellant who picked it up); *State v. Hage*, 532 N.W.2d 406, 411 (S.D. 1995) (an appellant, *inter alia*, gave investigators a false name and address and falsely claimed to have arrived at the scene of the crime after leaving a nonexistent job).

[12] *See, e.g.*, *People v. Raymond*, 81 A.D.3d 1076 (N.Y. Ct. App. 2011) (when an appellant was asked why he thought he was being arrested, he responded that he "would never molest [his] kids").

[13] *See also United States v. McDougald*, 650 F.2d 532, 533 (4th Cir. 1982) (citing *United States v. Bear Killer*, 534 F.2d 1253, 1260 (8th Cir. 1976)) (exculpatory statements "contradicted by evidence at trial justifies the giving of this jury instruction").

did not have a clear recollection of what had just transpired. Even giving this suggestion its greatest assertive value, no evidence was adduced at trial that Appellant had a clear recollection of the events, which means that whatever assertion can be derived from this statement about Appellant's awareness, it was not shown to be false.

In addition to these three comments not making any assertions which were shown to be false, they were not exculpatory. Even if we were to interpret Appellant's second statement as suggesting an incomplete or nonexistent recollection with respect to his conduct, such would not render the comment exculpatory, because voluntary intoxication—much less lack of memory—is no defense to the general intent offense of sexual assault charged here. *See, e.g.*, *United States v. Gonzales*, 78 M.J. 480, 486 (C.A.A.F. 2019); *United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019).

Since Appellant's statements were neither false nor exculpatory, the military judge's instruction was untethered to the evidence and unnecessary for the members to arrive at an intelligent decision, and it was error for him to overrule the Defense's objection to the instruction. In spite of this error, however, we are convinced Appellant suffered no prejudice, because evidence of an accused's guilty behavior demonstrating a consciousness of guilt extends well beyond providing false exculpatory statements and even reaches nontestimonial conduct. *See, e.g.*, *United States v. Cook*, 48 M.J. 64, 66 (C.A.A.F. 1998); *United States v. Baldwin*, 54 M.J. 551, 555–56 (A.F. Ct. Crim. App. 2000). Such evidence is admissible under Mil. R. Evid. 404(b) and includes situations in which an accused solicits false testimony[14] or—closer to Appellant's case—asks a witness not to testify.[15]

Appellant's comments to Ms. BW and Ms. JW could give rise to a host of inferences, some more indicative of a consciousness of guilt than others. For example, the members were free to conclude Appellant was trying to get a sense of what the women had witnessed and whether they would agree to not share that information. This evidence was properly admitted at trial, and trial counsel was free to argue Appellant had demonstrated a consciousness of guilt, which is to say the evidence and the argument was going to be in front of the members regardless of whether the military judge gave the instruction on false exculpatory statements.

Although it was not pertinent to Appellant's case, the military judge's instruction was a correct statement of law. More significantly, the military judge plainly explained to the members that it was up to them to determine whether

---

[14] *United States v. Borland*, 12 M.J. 855, 856–57 (A.F.C.M.R. 1981).

[15] *United States v. Dammerich*, 26 C.M.R. 219, 222 (C.M.A. 1958).

or not Appellant had made any false statements in the first place after he told the members there was evidence Appellant "*may have* provided a false explanation about the alleged offense" (emphasis added). He reiterated this point when he told the members they were responsible for deciding whether such statements amounted to a consciousness of guilt, and "the significance, *if any*, to be attached to any such evidence" (emphasis added). Trial counsel only marginally sought to capitalize on the military judge's instruction, largely arguing inferences that would be permissible even in the absence of the instruction. But even in that argument, trial counsel told the members to reference the instruction—an instruction which vested the members with the absolute discretion to determine whether Appellant's statements were indicative of a consciousness of guilt. We conclude Appellant suffered no prejudice, and the military judge's employment of the instruction was therefore harmless.

## D. Theory of Culpability

Appellant asks us to set aside his findings and sentence, arguing he was convicted under the theory that he engaged in sexual conduct with AM when she was too intoxicated to consent rather than by causing bodily harm to her, as he was charged. Appellant contends this denied him his due process rights to fair notice, a principle which "mandates that an accused has a right to know what offense and under what legal theory[ ] he will be convicted." *United States v. Tunstall*, 72 M.J. 191, 192 (C.A.A.F. 2013) (internal quotation marks and citations omitted).

Prior to trial, the Defense submitted a motion in limine asking the military judge to bar trial counsel from advancing any argument or theory that AM could not consent based upon either her being incapacitated due to her alcohol consumption or that she was asleep, unconscious, or otherwise unaware that she was participating in sexual conduct with Appellant. The military judge denied the motion, explaining the Government had to prove AM did not consent, and this would require "examination and consideration of all the facts and circumstances," including AM's level of intoxication, which the military judge concluded amounted to evidence of whether or not AM "effectively consented."

### 1. Law

The Fifth Amendment's[16] due process clause "does not permit convicting an accused of an offense with which he has not been charged." *Tunstall*, 72 M.J. at 192 (quoting *United States v. Girouard*, 72 M.J. 5, 10 (C.A.A.F. 2011)). A specification tried by court-martial will not pass constitutional scrutiny unless it both gives the accused notice of the charge he or she must defend against and shields him or her from being placed in double jeopardy. *United States v.*

---

[16] U.S. CONST. amend. V.

*Turner*, 79 M.J. 401, 404 (C.A.A.F. 2020) (citations omitted). The military is a notice-pleading jurisdiction. *United States v. Gallo*, 53 M.J. 556, 564 (A.F. Ct. Crim. App. 2000), *aff'd*, 55 M.J. 418 (C.A.A.F. 2001). A specification is sufficiently specific if it "informs an accused of the offense against which he or she must defend and bars a future prosecution for the same offense." *Id*. (citations omitted).

Article 120, UCMJ, presents various alternative theories of liability for the offense of sexual assault. Article 120(b)(1)(B), with which Appellant was charged, prohibits the commission of a sexual act by "causing bodily harm," while Article 120(b)(2) addresses sexual acts committed by a person who "knows or reasonably should know that the other person is asleep, unconscious, or otherwise unaware that the sexual act is occurring." 10 U.S.C. §§ 920(b)(1)(B), 920(b)(2). Article 120(b)(3)(A) further criminalizes sexual acts committed upon a person who is "incapable of consenting to the sexual act due to impairment by any drug, intoxicant or other similar substance" when that incapacitation is either known by, or reasonably should be known by, the perpetrator. 10 U.S.C. § 920(b)(3)(A).

In order to find Appellant guilty of sexual assault under Article 120(b)(1)(B) as charged here, the Government was required to prove beyond a reasonable doubt that: (1) Appellant committed a sexual act upon AM by causing penetration, however slight, of her vulva with his penis, (2) he did so by causing bodily harm to her, and (3) he did so without her consent. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(3)(b). "Bodily harm" is defined as "any offensive touching of another, however slight, including any nonconsensual sexual act or nonconsensual sexual contact." *MCM*, pt. IV, ¶ 45.a.(g)(3). In determining whether a person consented to the conduct at issue, "[a]ll the surrounding circumstances are to be considered," and "lack of consent may be inferred based on the circumstances of the offense." *MCM*, pt. IV, ¶ 45.a.(g)(8)(C). Trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted).

### 2. Analysis

Based upon both a plain reading of and application of standard legal-construction principles to the three theories of liability under Article 120, UCMJ, discussed above, we conclude the theories are separate and distinct. *See, e.g.*, *United States v. Weiser*, 80 M.J. 635, 640 (C.G. Ct. Crim. App. 2020); *cf. United States v. Sager*, 76 M.J. 158, 161–62 (C.A.A.F. 2017) (finding "asleep," "unconscious," and "otherwise unaware" in Article 120(b)(2) to represent distinct theories of culpability). Of the three, Article 120(b)(1)(B) implicitly requires proof the sexual act in question was nonconsensual in order to meet the definition of "bodily harm" when the bodily harm alleged is the same as the sexual act itself,

as is the case here. *See, e.g.*, *United States v. Gomez*, No. 201600331, 2018 CCA LEXIS 167, at \*11 (N.M. Ct. Crim. App. 4 Apr. 2018) (unpub. op.), *rev. denied*, 78 M.J. 108 (C.A.A.F. 2018). Moreover, this element of non-consent was expressly alleged in the text of the specification in Appellant's case.

At trial, the military judge gave the members instructions with respect to the requirement that the Government prove AM did not consent. In relevant part, he explained:

> "Consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal of [sic] resistance or submission resulting from the use of force, threat of force, or placing another person in fear, does not constitute consent. A current or previous dating or social or sexual relationship by itself, or the manner of dress of the person involved with the accused and the conduct at issue, shall not constitute consent.

> Lack of consent may be inferred based on the circumstances. All the surrounding circumstances are to be considered in determining whether a person gave consent or whether a person did not resist or ceased to resist only because of another person's action.

> The government has the burden to prove, beyond a reasonable doubt, that consent to the physical act did not exist. Therefore, to find [Appellant] guilty of the offense of sexual assault as alleged in the Charge and its Specification, you must be convinced, beyond a reasonable doubt, that [AM] did not consent to [Appellant] penetrating her vulva with his penis.

> Evidence concerning consent to the sexual conduct, if any, is relevant and must be considered in determining whether the government has proven the elements of the offense beyond a reasonable doubt. Stated another way, evidence the alleged victim consented to the sexual conduct, either alone or in conjunction with the other evidence in this case, may cause you to have a reasonable doubt as to whether the government has proven every element of the offense.

The military judge was not asked to, and did not *sua sponte*, give any instructions on the concepts of capacity or competency to consent.

As detailed above, the tenor of trial counsel's presentation to the members was that Appellant took advantage of AM while she was unconscious—presumably as a result of her intoxication—and he asked the members in his closing argument to infer AM did not consent. Significantly, AM never testified she

did not consent, and she said she had no recollection of whether she did or did not consent. Likely as a result of being confronted with trying a case involving a victim who could not affirmatively tell the members she did not consent to the sexual conduct, trial nearly exclusively focused on AM's apparent inability to consent. Given the Defense's motion to preclude this precise trial strategy (and the military judge's ruling permitting trial counsel to employ the strategy), Appellant can hardly claim he was surprised at trial that the Government's case followed the route it did. The real questions are whether the military judge erred in his ruling and whether Appellant was convicted of an offense other than the one he was charged with. We answer both of those questions in the negative.

Because Appellant was charged with assaulting AM by causing her bodily harm, the Government was required to prove beyond a reasonable doubt—as the military judge instructed the members—that AM did not consent to the sexual conduct. Trial counsel sought to do so by presenting the improbability that an apparently non-responsive AM actually did consent by focusing on how others perceived her and then asking the members to infer from her non-responsiveness the absence of consent. Requesting members to draw inferences from such circumstantial evidence is a common aspect of court-martial practice. *See, e.g.*, *United States v. Norman*, 74 M.J. 144, 151 (C.A.A.F. 2015). Article 120(g)(8)(C), UCMJ, specifically notes "[l]ack of consent may be inferred based on the circumstances of the offense" and "[a]ll the surrounding circumstances are to be considered in determining whether a person gave consent," a concept we have previously endorsed. 10 U.S.C. § 920(g)(8)(C); *see United States v. Moore*, 78 M.J. 868, 875 (A.F. Ct. Crim. App. 2019), *rev. denied*, 79 M.J. 203 (C.A.A.F. 2019). The military judge's instructions properly stated the Government's obligation in this regard, and trial counsel employed the entirely valid tactic of asking the members to draw a permissible inference from the circumstantial evidence which had been presented. Admittedly, direct evidence that AM did not consent to the sexual act is thin, but it was Appellant's burden to obtain AM's consent at the time of the sexual conduct, not AM's burden to manifest her lack of consent. *See McDonald*, 78 M.J. at 381.

The military judge correctly advised the members that consent "means a freely given agreement to the conduct at issue by a competent person."[17] The military judge did not give further instruction as to the definition of "competent," and trial counsel did not explicitly argue AM was not legally competent to consent, as he only used the word "competent" once in his argument when he repeated the military judge's definition of consent. Trial counsel argued that

---

[17] The CAAF has recently endorsed this exact instruction. *United States v. McDonald*, 78 M.J. 376, 381 (C.A.A.F. 2019).

AM had not, in fact, consented to the sexual conduct, but he asked the members to reach this conclusion by focusing almost entirely on AM's external manifestations of her ability to consent. In doing so, trial counsel explicitly conflated the issue of AM's actual consent with her ability to consent, describing AM as "unaware and unable to resist;" "passed out in a closet;" "dead to the world;" and "unable to consent."[18]

We consider arguments by trial counsel in the context of the entire court-martial, and we do not "surgically carve out a portion of the argument with no regard to its context." *Baer*, 53 M.J. at 238. Reviewing his comments in this context, we conclude the overall weight of trial counsel's argument centered on the premise that AM had not actually consented to sexual conduct with Appellant. He arrived at this point by highlighting evidence of AM's apparent inability to consent, which he marshalled as circumstantial evidence that AM did not, in fact, consent. We see nothing infirm with the proposition that a person *did not* consent because that person *could not* consent by virtue of being incapable of consenting; therefore, inability to consent provides strong evidence of a person's lack of actual consent. Demonstrating a lack of ability to consent, however, does not relieve the Government of the burden to prove absence of consent when consent is an element of the charged offense, as is the case here. *Cf. United States v. Riggins*, 75 M.J. 78, 84 (C.A.A.F. 2016) (proof of victim's inability to consent by virtue of being placed in fear is not equivalent to proof of victim's non-consent).

We see no reason why the Government may not use evidence of inability to consent—ordinarily the focal point of a prosecution under Article 120(b)(3), UCMJ—as circumstantial evidence of the lack of actual consent in a prosecution under Article 120(b)(1)(B), UCMJ. Therefore, we conclude evidence tending to show a person *could not* consent to the conduct at issue may be considered as part of the surrounding circumstances in assessing whether a person *did not* consent, and the military judge did not err in permitting trial counsel to employ this theory at Appellant's court-martial. Trial counsel's argument did not mislead the members or ask them to convict Appellant of any offense other than the one he was charged with committing.

Further, the military judge correctly instructed the members they were required to determine AM had not consented, and absent evidence to the contrary, we presume members follow a military judge's instructions. *United*

---

[18] Although trial defense counsel did not object to these comments by trial counsel when they were made, we do not find the absence of objection operates to forfeit the issue in light of Appellant's unsuccessful pretrial motion to prevent trial counsel from making this very argument.

*States v. Loving*, 41 M.J. 213, 235 (C.A.A.F. 1994) (citation omitted). Considering trial counsel's overarching argument that there was no evidence AM had consented, along with the military judge's accurate instructions and our recognition that there is a degree of logical evidentiary overlap in the Article 120, UCMJ, offenses, we are confident Appellant was convicted of the offense with which he was charged. We conclude Appellant was not denied due process, and we therefore decline to grant his requested relief.

### E. Post-trial Punishment

We find ourselves faced with yet another case of an Airman who says his pay has been miscalculated as a result of military justice processes. Appellant's two-pronged complaint is that: (1) the Defense Finance and Accounting Service (DFAS) erroneously reduced his grade from E-5 to E-1 as of the last day of his court-martial (rather than 14 days later) and (2) he was later improperly placed in a no-pay status while he was still on active duty and serving his sentence. He argues this deprivation both unlawfully increased his sentence and subjected him to cruel and unusual punishment under the Eighth Amendment[19] and Article 55, UCMJ, 10 U.S.C. § 855, and he asks us to grant him "meaningful sentence relief." We conclude Appellant has not demonstrated any error of constitutional dimension with respect to his pay, and we decline to grant him relief.

#### 1. Additional Background

Appellant's court-martial concluded on 22 March 2019, and we presume he immediately started serving his sentence to 45 days of confinement. According to a declaration he submitted to this court, Appellant asserts DFAS reduced his grade to E-1 for pay purposes effective on 22 March 2019.[20] Because the convening authority did not earlier take action on the sentence, Appellant's reduction in grade should not have been effective until 5 April 2019, 14 days after his sentence was imposed, pursuant to Article 57(a), UCMJ, 10 U.S.C. § 857(a). By operation of law, Appellant was required to automatically forfeit all pay and allowances starting the same day as this statutory reduction in

---

[19] U.S. Const. amend. VIII.

[20] Appellant submitted copies of his leave and earning statements to the court for the months of April through October 2019 in conjunction with his declaration. The April statement has an annotation which reads, "CHANGE GRADE 190322(101)." Appellant did not submit a leave and earning statement for March 2019, the month he entered confinement.

grade, continuing for the remainder of the time he spent in confinement. Article 58b, UCMJ, 10 U.S.C. § 858b.[21] Appellant was released from confinement on a day in May 2019; we cannot determine the precise date from the record.[22] Once released, Appellant should have received his pay at the E-1 rate so long as he remained in a duty status—that is, until he started his appellate leave.

The convening authority took action on 15 July 2019, approximately two months after Appellant was released from confinement, and presumably Appellant began serving his sentence to three months of hard labor without confinement at some point thereafter.[23] Appellant's clemency request, submitted on 8 July 2019, made no mention of any concerns with his pay.

Appellant asserts that not only did DFAS erroneously demote him 14 days early for pay purposes, that service created an "advance debt" against his pay and began deducting partial payments from his pay, resulting in reduced pay.[24] For example, after deductions for his child-support payment and rent for his on-base house, Appellant's mid-month take-home pay in May 2019 was $11.34, and his end-of-month take-home pay was $254.85. Appellant's take-home pay for the months of April, June, July, and August 2019 ranged from approximately $940.00 in April 2019 to approximately $1,075.00 in August. Some of the variability in his pay was the result of Appellant's child support payments increasing, his change of residency to a state with no income tax, and changes he made to some of his discretionary deductions.

---

[21] Nothing in the record indicates Appellant asked the convening authority to waive these automatic forfeitures for the benefit of his dependents—his wife and daughter—during his time in confinement.

[22] If Appellant immediately entered confinement at the conclusion of his court-martial and remained confined the entire 45 days he was sentenced to, his release date would have been 6 May 2019. In one of the documents Appellant filed with this court, he noted he was released from confinement "in May 2019," but he does not further identify the specific date.

[23] Unlike confinement and forfeitures, a sentence to hard labor without confinement does not begin until the convening authority takes action. Article 57(c), UCMJ, 10 U.S.C. § 857(c).

[24] The "advance debt" on Appellant's leave and earning statements was created as an entitlement (*i.e.*, added to his gross pay) in April 2019 in the amount of $1,396.86. Another advance debt was created in May 2019 for $88.27. Payments on this debt were then deducted from Appellant's monthly pay in varying amounts, ranging from $338.65 in April and $541.40 in May to $26.87 in September. According to his statements, Appellant paid $1,103.10 of this debt and still owed $382.03 as of the end of September 2019.

At some point in late August 2019, Appellant's enlistment apparently expired, resulting in Appellant being placed in a non-pay status in September and October 2019 despite the fact he remained on active duty in order to serve his court-martial sentence. Appellant received no take-home pay in his September mid-month and end-of-month pay or in his mid-October pay.[25]

In his declaration, Appellant asserts he repeatedly raised his concerns to his first sergeant beginning in the middle of May 2019. Appellant says he sought off-duty employment despite working 12-hour shifts seven days a week during his period of hard labor without confinement, resulting in stress and a lack of adequate sleep. Even with his second job, Appellant says he was unable to make his housing payments for his on-base house or pay child support for his daughter.[26] Exacerbating this situation, Appellant lost his military healthcare benefits, resulting in his wife and daughter being unable to obtain prescribed medications.

On 16 October 2019, Appellant filed a complaint under Article 138, UCMJ, 10 U.S.C. § 938, and he received the back pay he was due in two payments which were issued on 24 and 31 October 2019. In this complaint, Appellant asserted he was still serving his hard labor without confinement at the time with "a couple weeks left" to serve. The record does not disclose when Appellant completed this punishment or when he was ultimately placed on appellate leave.

### 2. Law

We review de novo allegations of cruel and unusual punishment in violation of the Eighth Amendment and Article 55, UCMJ. *United States v. Wise*, 64 M.J. 468, 473 (C.A.A.F. 2007) (citing *United States v. White*, 54 M.J. 469, 471 (C.A.A.F. 2001)). In general, we apply "the Supreme Court's interpretation of the Eighth Amendment to claims raised under Article 55, except in circumstances where . . . legislative intent to provide greater protections under [Article 55]" is apparent. *United States v. Avila*, 53 M.J. 99, 101 (C.A.A.F. 2000) (citation omitted). "[T]he Eighth Amendment prohibits two types of punishments: (1) those 'incompatible with the evolving standards of decency that

---

[25] Despite being in what Appellant refers to as a "no pay" status in September, DFAS did create an entitlement for his regular pay for that month but—after deducting various amounts, such as child support and taxes—placed the remaining balance in a hold status.

[26] Appellant's reference to his unpaid rent relates to the months of September and October 2019, as rent is shown as being deducted from Appellant's leave and earning statements from April through August 2019. Appellant's child support payments were also deducted in all of those statements, as well as from his September 2019 pay.

mark the progress of a maturing society' or (2) those 'which involve the unnecessary and wanton infliction of pain.'" *United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976)).

Once released from confinement, a service member in duty status "may not be deprived of more than two thirds of his or her pay." *United States v. Stewart*, 62 M.J. 291, 293 (C.A.A.F. 2006). *See also* R.C.M. 1107(d)(2), Discussion ("When an accused is not serving confinement, the accused should not be deprived of more than two-thirds pay for any month as a result of one or more sentences by court-martial and other stoppages or involuntary deductions, unless requested by the accused."). Imposing total forfeitures on a service member in a duty status "raises issues" under both the Eighth Amendment and Article 55, UCMJ. *United States v. Warner*, 25 M.J. 64, 66 (C.M.A. 1987).

Under Article 66(c), UCMJ, 10 U.S.C. § 866(c) we have broad authority and the mandate to approve only so much of the sentence as we find appropriate in law and fact and may, therefore, grant sentence relief, without finding a violation of the Eighth Amendment or Article 55, UCMJ. *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016); *see United States v. Tardif*, 57 M.J. 219, 223 (C.A.A.F. 2002). Unlike claims raised under Article 55, UCMJ, or the Eighth Amendment, we may not consider matters outside the record for a sentence-appropriateness review under Article 66(c), UCMJ, unless those matters amplify information already raised in the record, such as that which is raised to the convening authority as part of a clemency request. *United States v. Jessie*, 79 M.J. 437, 441–42 (C.A.A.F. 2020); *see also United States v. Matthews*, No. ACM 39593, 2020 CCA LEXIS 193, at *13–15 (A.F. Ct. Crim. App. 2 Jun. 2020) (unpub. op.).

### 3. Analysis

Appellant's complaint essentially points to two discrete pay-related events. First, he asserts DFAS demoted him 14 days early, resulting in him being paid at the E-1 rate instead of the E-5 rate for the period of 22 March 2019 through 5 April 2019. Second, he asserts his pay was improperly withheld in September and October 2019 due to being placed in a no-pay status.

With respect to the first allegation, we have carefully reviewed Appellant's complaint and the matters he submitted to this court, and we conclude Appellant has not adequately demonstrated a factual basis to support his claim such that we could either find error or assess what, if any, relief is warranted. Appellant's leave and earning statement includes the annotation "CHANGE GRADE 190322(101)," which tends to support Appellant's claim that his reduction to E-1 occurred—for pay purposes, at least—on 22 March 2019. Appellant, however, did not submit any documentation showing what, if any, impact this had on his March 2019 pay. Appellant's April and May 2019 leave and

earnings statements establish advance debts totaling just under $1,500.00, but nothing in those statements or any of the other documentation submitted by Appellant explains what that debt was for. Although some amount of that debt was possibly attributed to recouping pay Appellant may have received at the E-5 rate between 22 March 2019 and 5 April 2019, we think it is more likely the advance debt reflects recoupment of the pay Appellant received from 5 April 2019 through his release from confinement—a period of time in which Appellant continued to receive pay and allowances, all of which was to be forfeited by operation of law.[27]

Appellant's base pay in his April statement is shown as $1,166.19, while each subsequent statement shows his base pay as $1,680.90—a difference of just over $500.00. It is possible that $500.00 difference reflects a recoupment of pay Appellant received at the E-5 grade in March 2019, but we simply cannot tell based upon the information Appellant has provided. We also note Appellant continued to receive his housing allowance of $841.00 while he was in confinement, and we detect no efforts by the Government to recoup that allowance, even though it was subject to forfeiture under the UCMJ. As a result of the foregoing, we are unable to determine whether Appellant was actually deprived of any pay by virtue of DFAS assigning him a date of rank of 22 March 2019, much less how much pay he was deprived of.

Importantly, Appellant concedes he was eventually paid his back pay in full, although not until late October 2019. We also note that rather than completely stop Appellant's pay while he was subject to automatic and total forfeitures for nearly all of April 2019, DFAS apparently created an advance debt which allowed Appellant to gradually pay off his forfeitures over a series of monthly installments. This, in turn, allowed him to meet his child support, housing rental, and other financial obligations in April despite being subject to total forfeitures for nearly the entire month. Because we cannot determine what harm Appellant actually suffered, he has failed to demonstrate he was subjected to any punishment due to DFAS's annotation of the change in his date of rank. We therefore cannot conclude he suffered cruel and unusual punishment warranting relief.

Appellant's lack of pay in September and October 2019 is slightly more straightforward. His September 2019 leave and earning statement indicates

---

[27] The military judge advised the members that the monthly base pay for an E-1 at the time of Appellant's court-martial was $1,680.90. At that rate, Appellant would have forfeited approximately $1,400.00 in base pay for the period of 5 April through the end of the month, which is nearly exactly the amount of the advance debt Appellant was assigned for April: $1,396.86.

he entered a "held pay" status on the first of that month. Appellant still received his base pay, his basic allowance for subsistence, and his housing allowance. His child support, taxes, and several other expenses were deducted from his pay and allowances, and the remainder was withheld based upon the "held pay" status, which meant Appellant received no take-home pay. The October 2019 statement Appellant submitted is a mid-month statement with no detail other than that his net mid-month pay was zero; because of this lack of detail, we cannot determine whether Appellant's child support payment was not paid as he alleges. In any event, Appellant received less pay than he was entitled to beginning with his mid-month pay in September through the end of October when his pay issues were apparently reconciled.

While the Government concedes we have jurisdiction regarding the 14-day grade-reduction issue, it objects to our consideration of Appellant's September and October pay problems under the theory they are collateral to Appellant's conviction. *See, e.g.*, *United States v. Buford*, 77 M.J. 562, 566 (A.F. Ct. Crim. App. 2017). In *Buford*, the appellant was released from confinement and elected to take his accrued leave and receive his pay and allowances during that leave then start his appellate leave afterwards. *Id.* at 563–64. The appellant there never received his pay and he complained to this court his non-payment improperly increased his sentence, a claim we concluded was unrelated to the legality or appropriateness of an approved court-martial sentence and therefore outside of our Article 66(c), UCMJ, authority to grant sentence relief. *Id.* at 565. In this case, however, Appellant asserts his deprivation of pay amounted to violations of the Eighth Amendment and Article 55, UCMJ, matters which we do exercise jurisdiction over. Appellant's pay issues also bear a more direct nexus to his sentence than was the case in *Buford*, as Appellant's term of enlistment was extended for the purpose of him serving out his sentence to hard labor without confinement, and Appellant was still on duty and serving his court-martial sentence when he was denied pay. In addition, Appellant was serving that punishment in September and October of 2019 due to the timing of the convening authority's action, which occurred three and a half months after Appellant's court-martial. Thus, we conclude we do have jurisdiction over Appellant's complaint.

Although we have jurisdiction, we do not find a violation of either the Eighth Amendment or Article 55, UCMJ. In the context of a prisoner in confinement, the Supreme Court has held an Eighth Amendment violation requires an objectively, sufficiently serious deprivation resulting in "the minimal civilized measures of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). In addition, the prison official causing the deprivation must have a "sufficiently culpable state of mind." *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294 (1991)). Finally, we have required military prisoners to exhaust administrative grievance procedures as

well as seek relief under Article 138, UCMJ. *Lovett*, 63 M.J. at 215. Although Appellant was not in confinement when he was denied his pay, we still assess whether the person or persons inflicting the alleged harm had a culpable state of mind, which is to say the degree to which the harm was intended or recklessly permitted.

In this case, Appellant does not allege his pay was intentionally withheld in order to cause him to suffer. Rather, he argues the Government—specifically his unit leadership—displayed culpable indifference to his plight. The matters Appellant submitted to this court, however, somewhat undercut this claim, as they demonstrate more of a shortage of capability than of concern. From his submission, it is apparent Appellant's first sergeant and finance office personnel were engaged in trying to reconcile his pay issues, albeit ineffectually. Ultimately, the issue was resolved once Appellant made a complaint under Article 138, UCMJ, one indication of the wisdom of requiring complainants to first use that avenue before seeking judicial redress. Although we do not diminish the stressful challenge Appellant faced in maintaining his household without pay from the middle of September 2019 through the end of October 2019, we do not find that this amounts to punishment running afoul of societal decency or constituting unnecessary and wanton infliction of pain. We also note Appellant apparently received all the pay he was entitled to at the end of October 2019, and he has not alleged the denial of his pay for a month and a half has had any enduring impact on him—strong evidence Appellant was not denied "the minimal civilized measures of life's necessities." Based on the evidence before us, Appellant's pay troubles were rooted not in ill intent but in the unfortunate failure of finance and personnel officials to properly pay an Airman involved in the military justice system. This is insufficient to rise to the level of a violation of the prohibition of cruel and usual punishment under the Eighth Amendment and Article 55, UCMJ.

Appellant's allegations regarding his pay issues were not referenced in his clemency submission to the convening authority and were only raised for the first time in his appeal to this court. For the reasons set out in *Matthews*, we cannot consider Appellant's submissions on the matter in our review of his sentence under Article 66(c), UCMJ. *See* unpub. op. at *15.

**F. Post-Trial Delay**

Appellant was sentenced on 22 March 2019. The convening authority took action on 15 July 2019, and the case was docketed with this court on 1 August 2019. Appellant filed his initial assignments of error 329 days later on 25 June 2020 after requesting and receiving eight enlargements of time over the Government's objection. The Government filed its answer one month later, on 24 July 2020, to which Appellant replied on 29 July 2020.

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citing *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004); *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). In *Moreno*, the CAAF established a presumption of facially unreasonable delay when the Court of Criminal Appeals does not render a decision within 18 months of docketing. 63 M.J. at 142. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533).

This case exceeded the 18-month standard between docketing and appellate decision by just over one month. There are several factors explaining this delay. First, we note the record of trial is not insubstantial, including over 775 pages of transcript, 43 appellate exhibits, and several video recordings. Second, Appellant took nearly a year to file his assignments of error after requesting eight extensions. Third, Appellant asserted six errors, the careful consideration of which has resulted in a lengthy opinion from the court. In the face of these issues, we do not find egregious delay here, especially in light of the fact the bulk of the delay was at Appellant's behest.

Where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). Appellant was released from confinement prior to the convening authority taking action on his case, so he has not suffered any oppressive incarceration as a result of appellate delay. Because our opinion does not result in a rehearing, Appellant's ability to prepare for such a hearing has not been impacted. *See id.* at 140. With respect to anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* Appellant has not alleged any particularized anxiety or concern, and we do not discern such from our review of Appellant's case. Where, as here, there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to

"adversely affect the public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362. On the whole, we do not find the delay so egregious. *Id.*

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See Tardif*, 57 M.J. at 225. After considering the factors enumerated in *Gay*, 74 M.J. at 744, we conclude it is not.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court